

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID ALVERSON, Derivatively on
Behalf of Nominal Defendant
FARO TECHNOLOGIES, INC.,

        Plaintiff,

v.

        Case No. 6:08-CV-45-ORL-31UAM

JOHN CALDWELL,
STEPHEN COLE,
HUBERT D'AMOURS,
GREGORY A. FRASER,
ANDRE JULIEN, and
SIMON RAAB,

        Defendant.

And

FARO TECHNOLOGIES, INC.,

        Nominal Defendant.

_____/

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by the undersigned attorneys, submits this
Verified Shareholder Derivative Complaint (the "Complaint")
against the defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought for
the benefit of nominal defendant FARO Technologies, Inc.

("FARO" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

4.    Plaintiff   David   Alverson   ("Plaintiff")   was   a
shareholder  of  nominal  defendant  FARO  at  the  time  of  the
wrongdoing  alleged  herein  and  has  been  a  shareholder  of  FARO
continuously since that time.

5.    Nominal    defendant    FARO    is    a    corporation
incorporated  under  the  laws  of  the  State  of  Florida,  and
maintains  its  principal  executive  offices  at  125  Technology
Park,  Lake  Mary,  Florida  32746.   According  to  its  public
filings,   FARO   designs,   develops,   and   markets   portable,
computerized  measurement  devices  and  software  used  to  create
digital  models  for  anything  requiring  highly  detailed  3-D
measurements.

6.    Defendant  John  Caldwell  ("Caldwell")  is,  and  was  at
all  times  relevant  hereto,  a  director  of  FARO.   Caldwell  has
served  as  a  director  of  FARO  since  2002.   Since  at  least
2003,  Caldwell  has  served  as  a  member  and  the  chairman  of  the
Operational  Audit  Committee  of  the  Board  ("OAC").   According
to  the  Company's  annual  proxy  statement  filed  with  the  SEC  on
April  20,  2007  (the  "Proxy"),  the  OAC  is  responsible  for,
among  other  things,  reviewing  the  operational  metrics  of  the
Company.   The  OAC  also  meets  with  department  directors  to

review progress against Company goals. Since March 12, 2004, Caldwell has served as a member and the chairman of the Audit Committee of the Board ("AC"). According the Proxy, the AC, among other things, is responsible for reviewing the Company's annual financial results and the Company's periodic reports before filing with the United States Securities and Exchange Commission ("SEC").

7.    Defendant Stephen Cole ("Cole") is, and was at all times relevant hereto, a director of FARO. Cole has served as a director of FARO since 2000, and as the Company's Lead Director since 2005. Since at least 2003, Cole has served as a member of the AC. At times relevant hereto, Cole sold more than 32,000 shares of FARO common stock for proceeds in excess of $856,000 based upon material inside information concerning the Company's financial condition that was not available to the investing public.

8.    Defendant Hubert d'Amours ("d'Amours") is, and was at all times relevant hereto, a director of FARO. d'Amours has served as a director of FARO since 1990. Since at least 2003, d'Amours has served as a member of the AC. At times relevant hereto, d'Amours sold more than 11,000 shares of FARO common stock for proceeds in excess of $308,000 based

4

upon material inside information concerning the Company's financial condition that was not available to the investing public.

9.    Defendant Gregory A. Fraser ("Fraser") was at all times relevant hereto a director of FARO.  Fraser, along with defendant Simon Raab, co-founded FARO in 1982.  Fraser served as a director of FARO from 1982 until his resignation in December 2006.   Fraser also served as the Executive Vice President and Chief Financial Officer of the Company from May 1997 until February 2005, and as Executive Vice President and Secretary of the Company until June 2006.  At times relevant hereto, Fraser sold more than 78,000 shares of FARO common stock for proceeds in excess of $1.8 million based upon material inside information concerning the Company's financial condition that was not available to the investing public.

10.   Defendant Andre Julien ("Julien") is, and was at all times relevant hereto, a director of FARO.   Julien has served as a director of FARO since 1986.   Since at least 2003, Julien has served as a member of the AC.

11.    Defendant Simon Raab ("Raab") is, and was at all times relevant hereto, a director and Chairman of the Board of FARO.   Raab, along with Fraser, co-founded FARO in 1982. Raab has served as a director and Chairman of the Board of FARO since 1982, and also served as the Company's Chief Executive Officer from 1982 until January 2006, as the Company's Co-Chief Executive Officer from January 2006 until December 2006, and as the Company's President from 1986 until 2004.   At times relevant hereto, Raab sold more than 148,000 shares of FARO common stock for proceeds in excess of $4.3 million based upon material inside information concerning the Company's financial condition that was not available to the investing public.

12.    Defendants Caldwell, Cole and d'Amours may be referred to collectively herein as the "AC Defendants." Defendants Caldwell and Julien may be referred to collectively herein as the "OAC Defendants."   The AC Defendants and the OAC Defendants may be referred to collectively herein as the "Audit Committee Defendants."   The Defendants named in paragraphs 6-11 herein may be referred to herein as the "Individual Defendants," and together with FARO as the "Defendants."

6

## DUTIES OF THE INDIVIDUAL DEFENDANTS

13. By reason of their positions as officers, directors, and/or fiduciaries of FARO and because of their ability to control the business and corporate affairs of FARO, the Individual Defendants owed FARO and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage FARO in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of FARO and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to FARO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

14. The Individual Defendants, because of their positions of control and authority as directors and/or officers of FARO, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various

7

public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with FARO, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

15.  To discharge their duties, the officers and directors of FARO were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of FARO were required to, among other things:

> a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;
>
> c.  Exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP");
>
> d.  When put on notice of problems with the Company's business practices and

> operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and
>
> e. Refrain from acting upon material inside corporate information to benefit themselves.

16. The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and for ensuring that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

> a. Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> b. Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
>> i. transactions are executed in accordance with management's general of specific authorization; and
>>
>> ii. transactions are recorded as necessary to permit preparation

> of financial statements in
> conformity with generally
> accepted accounting principles.

17.   In addition to the duties owed by all Individual Defendants, the Audit Committee Defendants were and are each under an obligation to abide by their fiduciary responsibilities in fulfilling their duties as members of the OAC and/or AC.

18.   According to the Charter of the OAC, the OAC Defendants were and are responsible for, among other things:

> a.   Reviewing the Company's performance against operational metrics at the corporate, divisional and departmental level; and
>
> b.   Meeting with department directors to ensure that goals and measures are properly aligned with corporate strategy.

19.   According to the Charter of the AC, the AC Defendants were and are responsible for, among other things:

> a.   Discussing with management its efforts to communicate the importance of internal controls;
>
> b.   Reviewing disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and

any fraud involving management or other employees who have a significant role in the Company's internal controls;

c.   At least annually, asking management and the external auditors about significant risks and exposures and the plans to minimize such risks; requesting that management and the external auditors provide updates to the Committee as appropriate;

d.   Reviewing and discussing with management and the external auditors the quarterly and annual earnings press releases; provided that the responsibility for such review may be delegated to one or more members of the Committee;

e.   Reviewing and discuss with management and the external auditors the annual audited financial statements to be included in the Company's annual report on Form 10-K; and, based on the foregoing review and discussion, recommending to the Board whether the audited financial statements should be included in the Company's Form 10-K;

f.   Reviewing and discussing with management and the external auditors the management's discussion and analysis ("MD&A") and other sections of the annual report before its release;

g.   Consulting with management and the external auditors, as appropriate, regarding matters related to the preparation of quarterly financial information;

h.   Reviewing and discussing with management the interim financial statements and MD&A included in each quarterly Form 10-Q prior to filing thereof with the SEC; provided that the responsibility for such review may be

delegated to one or more members of the Committee;

i.      Periodically obtaining updates from management, general counsel, and tax director regarding compliance with applicable laws and regulations and applicable internal conflict of interest policies and procedures; and

j.      Periodically receiveing updates from management and the external auditors regarding regulatory compliance matters.

## FACTUAL ALLEGATIONS

### The Individual Defendants Cause FARO to Issue False and Misleading Financial Statements

20.    Between April 16, 2004 and February 15, 2006, the Individual Defendants knew that the Company's internal financial controls were ineffective due to their own failure to fulfill their responsibilities and duties by ensuring their effectiveness.   The Individual Defendants' failure to ensure that financial controls were effective which resulted in them causing the Company to materially overstate its financial results by failing to properly value its inventory and Selling, General, and Administrative ("SG&A") expenses. In addition, the Individual Defendants knew that the Company was engaging in certain unlawful business practices in the Asia/Pacific region.   Specifically, as FARO later admitted, the Company's employees were routinely making unlawful

12

payments in connection with foreign sales activities in China, which payments caused the Company to inflate its financial results for the years ended December 31, 2004 and 2005.

21.   During this time period, the Individual Defendants knowingly caused the Company to make a series of false and misleading statements concerning the Company's financial condition, materially misrepresenting that the Company's financial condition was better than it actually was. Furthermore, FARO, through the Individual Defendants, made a series of false and misleading statement concerning the condition of the Company's internal controls, materially misrepresenting that the Company maintained sound internal controls and was able to regulate its business in accordance with applicable laws and regulations. As a result of these materially false and misleading statements, the Individual Defendants falsely inflated the Company's stock price, and subjected the Company to costs, fines, and other damages associated with the Company's unlawful and improper business practices, even though the Individual Defendants knew that the information provided to the investing public was

untruthful, and knew that their conduct was harming the Company.

22.    On April 15, 2004, the Company issued a press release in which it pre-announced its 1Q04 financial results, which stated in relevant part:

> FARO Technologies, Inc. (Nasdaq: FARO) today reported sales of approximately $21.0 million for the fiscal first quarter ended April 3, 2004, a 56.7% increase from $13.4 million in the first quarter of 2003, and $1.0 million, or 5.0% above the high end of the Company's $19-$20 million forecast for the quarter. Backlog at April 3, 2004 was approximately $5.6 million. The Company reported new order bookings of approximately $19.1 million during the first quarter, an increase of $5.6 million, or 41.5% compared with approximately $13.5 million in the year-ago quarter.

> "Based on the 41.5% increase in new orders in the first quarter we are increasing our sales forecast for 2004 to $90-$93 million, a 25%-30% increase over $71.8 million in 2003," said Simon Raab, Faro's President and CEO. "We intend to review our earnings guidance for 2004 in conjunction with our first quarter earnings release."

> The Company expects to issue its complete earnings release for the first quarter of 2004 in early May 2004.

23.    Shortly thereafter, on May 6, 2004, the Company issued a second press release concerning its 1Q04 financial results, and provided guidance for the remainder of FY04, which stated in relevant part:

14

FARO Technologies, Inc. (Nasdaq: FARO) today reported a 473% increase in net income in the first quarter of 2004 to $2.8 million, or 20 cents per diluted share, from $489,000, or four cents per diluted share in the first quarter of 2003. Fully diluted shares grew approximately two million shares or 16.5% to 14.1 million shares at April 3, 2004, from 12.1 million shares at March 29, 2003. Sales for the quarter increased 56.7% to $21.0 million, from $13.4 million in the first quarter of 2003. Gross margin increased eight percentage points to 64.0% in the quarter, from 56.0% in the first quarter of 2003, as a result of lower service expenses, less price discounting, and increased production efficiencies.

Selling, general and administrative ("SG&A") expenses decreased as a percentage of sales from 41.4% in the first quarter of 2003 to 38.6% in the first quarter of 2004. On a sequential quarter basis SG&A expenses as a percentage of sales increased 0.9 percentage points compared to 37.7% in the fourth quarter of 2003, resulting from higher selling expenses as a percentage of sales, partially offset by lower general and administrative expenses as a percentage of sales. The Company had forecast this increase in selling expenses as a percentage of sales in the first half of 2004, primarily as a result of costs related to the expansion of its worldwide sales force.

Income from operations increased $2.8 million from $459,000 in the first quarter of 2003 to $3.3 million in the first quarter of 2004. This increase was primarily a result of an increase in gross profit of $6.0 million, offset by a $2.5 million increase in SG&A expenses. On a sequential quarter basis, operating margin improved to 15.9% in the first quarter of 2004, compared to 11.8% in the fourth quarter of 2003.

Income tax expense in the first quarter of 2004 was $765,000 or 21.2% of taxable income, in line with the 20%-25% guidance given by the Company for 2004,

and compared to $72,000, or 12.9% of taxable income in the year-ago quarter.

"We showed continued strong year-over-year growth in the first quarter, continuing a trend shown throughout 2003," said Simon Raab, President and CEO. "We took a number of initiatives in the quarter to help continue our penetration into the large, underserved CAM2 market. These included expansion of our sales force around the world, with an emphasis in the Asia/Pacific, and the establishment of service centers in key newer markets including Brazil, Japan, and China. Besides expanding into new geographic regions, we are also focused on further penetrating our larger existing customers. Sales to existing customers represented 68% of total sales in the quarter, compared to 62% in all of 2003."

Regionally, sales in the Americas increased 57.4% in the first quarter of 2004 to $8.5 million, from $5.4 million in the first quarter of 2003. Sales in the Europe/Africa region increased 65.6% to $10.1 million, from $6.1 million in 2003. Sales in the Asia/Pacific region grew 26.3% to $2.4 million, from $1.9 million in 2003.

\* \* \*

### Outlook for the Remainder of 2004.

As stated in an earlier news release, on the basis of new order growth in the first quarter, we are now expecting sales for 2004 to be $90-$93 million, a 25%-30% increase compared to $71.8 million in 2003. We expect gross margins to be in a range of 59%-63% in the remaining quarters of 2004, and we expect that the higher gross margins will be somewhat offset by taxes at the higher end of our 20-25% guidance, so we are maintaining our earlier forecast for net income at $0.71-$0.86 per diluted share. (Emphasis added.)

16

24.    On May 14, 2004, the Company filed with the SEC its Form 10-Q for 1Q04, which falsely stated that the Company's internal controls were effective:

> As of the end of the period covered by this Quarterly Report on Form 10-Q, the Company carried out an evaluation, under the supervision and with the participation of the Company's Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended. Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information relating to the Company required to be included in the Company's periodic SEC reports.

25.    The May 14, 2004 10Q also stated that the Company expected "higher percentage sales growth in the Asia Pacific region than other regions in 2004 and 2005 as a results of opening its China Sales office [.]"

26.    On July 15, 2004, the Company issued a press release in which it pre-announced its 2Q04 financial results, which stated in relevant part:

> FARO Technologies, Inc. (NASDAQ: FARO) today reported sales of approximately $24.1 million, a record for any quarter, in the fiscal second quarter ended July 3, 2004, a 48.8% increase from approximately $16.2 million in the second quarter of 2003. The Company reported new order bookings of

17

approximately $21.9 million during the second quarter, an increase of $5.7 million, or 35.2% compared with approximately $16.2 million in the year-ago quarter.

Sales were highest in Europe at $10.8 million, an increase of $3.9 million, or 56.5% compared to $6.9 million in the second quarter of 2003. Sales in the Americas increased 27.2% to $10.3 million compared to $8.1 million in the second quarter of 2003. Sales in the Asia/Pacific region increased 130.8% to $3.0 million from $1.3 million in the second quarter of 2003.

"We are maintaining our sales forecast for 2004 at $90-$93 million, a 25%- 30% increase over $71.8 million in 2003, based on the 35.2% increase in new orders in the second quarter, and our historical cyclical sales pattern," said Simon Raab, Faro's President and CEO. "We intend to review our earnings guidance for 2004 in conjunction with our second quarter earnings release." (Emphasis added.)

27. Shortly thereafter, on August 4, 2004, the Company issued a second press release concerning its 2Q04 financial results, and provided guidance for the remainder of FY04, which stated in relevant part:

FARO Technologies, Inc. (Nasdaq: FARO) today reported a 156 % increase in net income in the second quarter of 2004 to $4.1 million, or 29 cents per diluted share, from $1.6 million, or 12 cents per diluted share in the second quarter of 2003. Sales for the quarter increased $7.9 million, or 48.8 % to $24.1 million, from $16.2 million in the second quarter of 2003. New orders in the second quarter increased $5.7 million, or 35.2% to $21.9 million, compared to $16.2 million in the second quarter of 2003. Gross margin increased 1.3 percentage points to 63.2% in the quarter, from

18

61.9% in the second quarter of 2003. Selling, general and administrative ("SG&A") expenses decreased as a percentage of sales from 41.7 % in the second quarter of 2003 to 36.8% in the second quarter of 2004.

Income from operations increased $3.0 million from $1.6 million in the second quarter of 2003 to $4.6 million in the second quarter of 2004. This increase was primarily a result of an increase in gross profit of $5.1 million, offset by a $2.1 million increase in SG&A expenses. On a sequential quarter basis, operating margin improved to 19.2% in the second quarter of 2004, compared to 15.9% in the first quarter of 2004.

Income tax expense in the second quarter of 2004 was $760,000 or 15.6% of income before taxes, compared to $240,000 or 13.3% in the year-ago quarter. Income tax expense as a percentage of taxable income was lower than the Company's 20%-25% forecast because the Company was able to realize additional tax loss carry-forwards in its European operations. The Company expects to realize additional tax loss carry-forwards through the balance of 2004, resulting in an estimated income tax rate of 15%-20% in the second half of 2004.

Regionally, sales in the Americas increased 27.2% in the second quarter to $10.3 million, from $8.1 million in the second quarter of 2003. Sales in the Europe/Africa region increased 56.5% to $10.8 million, from $6.9 million in 2003. Sales in the Asia/Pacific region grew 130.8% to $3.0 million, from $1.3 million in 2003. The Company also announced that it would add direct sales offices in South Korea and India to its Asia/Pacific group in the second half of 2004.

"The second quarter results bring our trailing twelve month's earnings per share to $0.97, and we are now approaching the target financial model that we set as a goal several years ago," said Simon Raab, President and CEO. "To solidify our market

leading position and continue our growth momentum, we are going to ramp up research and development spending to 6%-7% of sales, open more direct sales offices in Asia/Pacific, and add approximately 20 application engineers to our worldwide sales organization, to provide additional customer support for our newer Laser Tracker and Faro Gage products. We will continue to manage our costs vigilantly, but we expect to incur approximately $500,000 in professional fees in the second half of this year to assist FARO in its Sarbanes Oxley Section 404 compliance activities. These additional costs may be offset by higher sales in Asia/Pacific contingent on ramping our capabilities and activities in this market. As such we have tempered our revised earnings estimates for 2004."

### Outlook for the remainder of 2004.

We expect sales in the third and fourth quarters to reflect the seasonality apparent in our 5- year experience prior to 2003, rather than the linear growth seen in 2003. We expect new orders in the second half of 2004 to be approximately $45-$47 million, compared to $41 million in the first half. Since we have improved our production metrics, we have brought our backlog down to a customer-acceptable 2-3 weeks of sales, and we expect sales to track the new order rate, or the book to bill ratio to be approximately one. Therefore we are maintaining our forecast for 2004 sales at $90-$93 million.

Given our first half earnings, and the expected impact of the second half costs mentioned above, we are raising our earlier forecast for net income of $0.71-$0.86 per diluted share, to $0.85-$1.00 per diluted share in 2004.

28.    On May 14, 2004, the Company filed with the SEC its Form 10-Q for 2Q04, which falsely stated that the Company's internal controls were effective:

As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended. Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information relating to the Company required to be included in our periodic SEC reports.

29.   On October 14, 2004, the Company issued a press release in which it pre-announced its 3Q04 financial results, which stated in relevant part:

FARO Technologies, Inc. (NASDAQ: FARO) today reported sales of approximately $23.4 million in the fiscal third quarter ended October 2, 2004, a 21.9% increase from $19.2 million in the third quarter of 2003. The Company also reported new order bookings of approximately $23.4 million during the second quarter, an increase of $6.1 million, or 35.3%, compared with approximately $17.3 million in the year-ago quarter.

"Based on our 36% growth in new orders year-to-date, we are raising our sales forecast for 2004 to $94-$100 million," said Simon Raab, Faro's President and CEO. "We intend to review our earnings guidance for 2004 in our third quarter earnings release."

30.   Shortly thereafter, on November 4, 2004, the Company issued a second press release concerning its 3Q04

financial results, and provided guidance for the remainder of FY04, which stated in relevant part:

> FARO Technologies, Inc.(Nasdaq: FARO) today reported net income of $3.1 million, or 22 cents per diluted share in the third quarter of 2004, compared to $3.3 million, or 26 cents per diluted share in the third quarter of 2003, which included $1.1 million (8 cents per diluted share) in other income related to a settlement from arbitration. Sales for the quarter increased $4.2 million, or 21.9% to $23.4 million, from $19.2 million in the third quarter of 2003. New orders in the third quarter increased $6.1 million, or 35.3% to $23.4 million, compared to $17.3 million in the third quarter of 2003. Gross margin increased 5.6 percentage points to 63.1% in the quarter, from 57.5% in the third quarter of 2003.

> Income from operations increased $1.1 million from $2.7 million in the third quarter of 2003 to $3.8 million in the third quarter of 2004. This increase was primarily a result of an increase in gross profit of $3.8 million, offset by a $2.4 million increase in SG&A expenses. Operating margin improved to 16.4% in the third quarter of 2004, compared to 14.1% in the third quarter of 2003.

> Income tax expense in the third quarter of 2004 was $690,000 or 18% of income before taxes, compared to $488,000 or 13% in the year-ago quarter. Regionally, sales in the Americas decreased marginally from $10.4 million in the third quarter of 2003 to $9.9 million in the third quarter of 2004, while new orders increased 22.4% from $8.5 million in the third quarter of 2003 to $10.4 million in the third quarter of 2004. Sales in the Europe/Africa region increased 50.0% to $9.9 million from $6.6 million in the third quarter of 2003 resulting in large part from the successful deployment of 20 new sales people. Sales in the Asia/Pacific region grew 66.7% to $3.5 million,

from $2.1 million in the third quarter of 2003 primarily due to $1.0 million in sales from the Company's new sales offices in China.

"As we forecast last quarter, higher sales in Asia and Europe along with a continued strong gross margin helped to offset higher G&A costs in part related to our Sarbanes Oxley Section 404 compliance activities, and start up costs in Korea and India," said Simon Raab, CEO. "We expect to incur an additional $500,000 in professional fees in the fourth quarter to assist FARO in its Sarbanes Oxley Section 404 compliance activities. In addition to our international expansion, we will continue to invest in new research and development initiatives and the addition of application engineers to support our newer products. We are taking these steps in an effort to create and capture an increasing portion of the large, underserved CAM2 market."

<u>Outlook for the remainder of 2004</u>

We expect sales in the fourth quarter to be in the range of $25.5 - $31.5 million, which will bring our total for 2004 to our previously announced increased range of $94-$100 million. The fourth quarter is usually the strongest, based on our typical seasonality. As a result of our year-to-date earnings per share and our forecasted sales or the fourth quarter, we are raising our earlier forecast for net income of $0.85-$1.00 per diluted share in 2004 to $0.95-$1.05.

31.    On November 10, 2004, the Company filed with the SEC its Form 10-Q for 3Q04, which falsely stated that the Company's internal controls were effective:

As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of the Chief Executive Officer and

23

the Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended. Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information relating to the Company required to be included in our periodic SEC reports.

32.   On November 18, 2004, the Company announced in a Form 8-K filing with the SEC that it was dismissing Ernst & Young as its auditor, and that it would be retaining Grant Thornton as its new auditor.

33.   On January 18, 2005, the Company issued a press release in which it pre-announced its 4Q04 and FY04 financial results, which stated in relevant part:

FARO Technologies, Inc. (NASDAQ: FARO) today reported sales of approximately $28.8 million in the fiscal fourth quarter ended December 31, 2004, a 25.2% increase from $23.0 million in the fourth quarter of 2003. The Company reported new order bookings of approximately $30.9 million during the fourth quarter, an increase of $9.8 million, or 46.4% compared with approximately $21.1 million in the year-ago quarter.

For the fiscal year ended December 31, 2004 the Company reported sales of approximately $97.3 million, a 35.5% increase from $71.8 million in fiscal 2003. New order bookings for fiscal 2004 were approximately $96.7 million, a 42.6% increase from approximately $67.8 million in fiscal 2003. The Company set fiscal 2005 sales estimates at

24

approximately $122-$126 million, a 25%-30% increase from approximately $97.3 million in fiscal 2004.

34.    Shortly thereafter, on March 9, 2005, the Company issued a second press release concerning its 4Q04 and FY04 financial results, which stated in relevant part:

FARO Technologies, Inc. (NASDAQ: FARO) today announced results for the fourth quarter and year ended December 31, 2004. Net income for the fourth quarter was approximately $4.9 million, or $0.34 per diluted share, a 69.0% increase compared with $2.9 million, or $0.22 per diluted share in the fourth quarter of 2003. Net income for the full year 2004 was approximately $14.9 million, or $1.06 per diluted share, a 79.5% increase compared with $8.3 million, or $0.64 per diluted share in fiscal 2003, and slightly higher than the Company's forecasted earnings per diluted share range of $0.95-$1.05.

Sales for the fourth quarter of 2004 were approximately $28.5 million, an increase of $5.5 million, or 23.9% from $23.0 million in the fourth quarter of 2003. New order bookings for the fourth quarter were approximately $30.9 million, an increase of $9.8 million, or 46.4% compared with approximately $21.1 million in the year-ago quarter. For the fiscal year ended December 31, 2004, the Company reported sales of approximately $97.0 million, a 35.1% increase from $71.8 million in fiscal 2003. New order bookings for fiscal 2004 were approximately $96.7 million, a 42.6% increase from approximately $67.8 million in fiscal 2003. Sales in 2004 were in the middle of the $95-$100 million range forecast by the Company. "New order bookings in Asia/Pacific in the fourth quarter were approximately20% of total new order bookings in the quarter," said Simon Raab, Chief Executive Officer. "We expect some variations in this percentage from quarter to quarter going forward, but we are

encouraged by the returns we are seeing on our investment in that region."

Gross margin for the fourth quarter of 2004 was approximately 58.0%, compared to 59.6% in the fourth quarter of 2003. Gross margin in the fourth quarter was less than in the previous three quarters of 2004 partly as a result of a higher proportion of sales coming from demonstration equipment, which carry lower margins. Gross margin for fiscal 2004 was 61.8%, a 2.9 percentage point improvement from 58.9% in fiscal 2003. Gross margin for fiscal 2004 was within the Company's target full-year range of 60%-65%.

Selling, general and administrative ("SG&A") expenses were approximately $11.6 million, or 40.7% of sales in the fourth quarter, an increase of $2.6 million from $9.0 million or 39.1% of sales in the fourth quarter of 2003. SG&A expenses for fiscal 2004 were approximately $37.6 million or 38.8% of sales, an increase of $9.4 million from $28.2 million, or 39.3% of sales in fiscal 2003. Selling expenses as a percentage of sales were 29.0% of sales in the fourth quarter of 2004, higher than the average of 25.7% for the three previous quarters in 2004 in part because of the Company's establishment of new sales offices in India and Korea, and continued expansion of the offices in China. Selling expenses as a percentage of sales for fiscal 2004 were 26.7%, somewhat higher than the Company's full-year target of 25%.

Research and development ("R&D") expenses were approximately $1.5 million for the fourth quarter of 2004, virtually unchanged from $1.5 million in the fourth quarter of 2003. R&D expenses for fiscal 2004 were approximately $5.4 million, an increase of $0.9 million from $4.5 million in fiscal 2003. R&D expenses as a percentage of sales in 2004 were 5.6%, within the Company's target full-year range of 5%-7%.

26

Operating margin for the fourth quarter of 2004 was approximately 9.8%, a decrease of 2.0 percentage points from 11.8% in the fourth quarter of 2003, as a result of the previously mentioned lower gross margin and higher selling expenses in the quarter. Operating margin for fiscal 2004 was 15.0%, an increase of 4.6 percentage points compared to 10.4% in fiscal 2003, and within the Company's target full-year range of 15%-20%.

Income before income tax for the fourth quarter was approximately $3.1 million, a slight decrease from $3.3 million in the fourth quarter of 2003. Income before income tax for fiscal 2004 was approximately $15.3 million, an increase of $5.9 million, or 62.8% from $9.4 million in fiscal 2003.

The Company had an income tax benefit of approximately $1.9 million for the fourth quarter of 2004, due primarily to the release of approximately $1.7 million in valuation allowance on foreign deferred tax assets relating to net operating losses which the Company now believes are more likely than not to be realized. The Company calculated the amount to release from the valuation allowance in the fourth quarter using projections of future earnings over the next two years. The income tax rate of 2.3% for fiscal 2004 was significantly less than the Company's long-term target of 25%.

**Sarbanes-Oxley Section 404 Internal Controls Update**

The Company expects to file the report of its auditor regarding its compliance with Sarbanes-Oxley Section 404 in its Form 10-K, which it expects to file by March 16, 2005. "While disappointed with the cost and effort required to meet this standard, we have vigorously undertaken efforts to positively comply. I am proud of our entire organization for staying focused on our business while also accommodating the internal and external audit of internal controls," said Raab.

27

## Outlook for 2005

We continue to forecast 25%-30% sales growth in 2005 compared to 2004, to approximately $121-$126 million. Based on a 20% income tax rate we forecast 2005 net income to be approximately $14.5-$19.0 million, or $1.03-$1.36 per diluted share. This forecast includes an estimated cost of $2 million as calculated under the Black-Scholes method of FAS 123, related to our expected adoption of FAS 123(R) for the expensing of stock options.

35.   On March 16, 2005, the Company filed with the SEC its Form 10-K for 4Q04 and FY04, which falsely stated that the Company's internal controls were effective:

As of December 31, 2004, management carried out an evaluation, under the supervision and with the participation of its Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures as such term is defined under Securities Exchange Act of 1934, as amended (the "Exchange Act") Rule 13a-15(e). Based on this evaluation, management has concluded that as of December 31, 2004, such disclosure controls and procedures were effective to provide reasonable assurance that the Company records, processes, summarizes and reports the information the Company must disclose in reports that the Company files or submits under the Exchange Act within the time periods specified in the SEC's rules and forms.

36.   In addition, the FY04 10-K also stated that that Company's net inventories were valued at $16,377,770.

28

37.   On April 12, 2005, the Company issued a press release in which it pre-announced its 1Q05 financial results, which stated in relevant part:

> FARO Technologies, Inc. (NASDAQ: FARO) today reported sales of approximately $27.3 million, in the fiscal first quarter ended April 2, 2005, a 30.0% increase from approximately $21.0 million in the first quarter of 2004. The Company also reported new order bookings of approximately $25.1 million during the first quarter, an increase of $6.0 million, or 31.4% compared with approximately $19.1 million in the year-ago quarter.
>
> "Based on our 31% growth in new orders year-to-date, we are maintaining our sales forecast for 2005 of $121-$126 million," said Simon Raab, FARO's Chairman and CEO. "We are pleased with the sales growth in the quarter which is in line with our 25%-30% guidance for the year."

38.   Shortly thereafter, on May 9, 2005, the Company issued a second press release concerning its 1Q05 financial results, and provided guidance for the remainder of FY05, which stated in relevant part:

> FARO Technologies, Inc. (Nasdaq: FARO) today reported net income for the first quarter ended April 2, 2005 of approximately $3.47 million or $0.24 per diluted share, a 21.8% increase compared with $2.85 million, or $0.20 per diluted share in the first quarter of 2004. Sales for the first quarter of 2005 were approximately $27.6 million, an increase of $6.6 million, or 31.4% from $21.0 million the first quarter of 2004. New order bookings for the first quarter were approximately $25.1 million, an increase of $6.0 million, or 31.4% compared with approximately $19.1 million in

the year-ago quarter. The sales increase in the first quarter of 2005 was higher than the 25%-30% annual growth forecast by the Company for all of 2005.

Regionally sales increased 28.2% in the Americas to $10.9 million, from $8.5 million in the first quarter of 2004. Sales increased 16.8% in Europe/Africa to $11.8 million from $10.1 million in the first quarter of 2004. In the Asia/Pacific region sales increased 104% to $4.9 million from $2.4 million in the first quarter of 2004.

"Our investment in the Asia/Pacific region continues to show good returns as sales and new order bookings in Asia/Pacific in the first quarter were approximately 17.6% and 20.1% of total sales and total new order bookings in the quarter, respectively," said Simon Raab, Chief Executive Officer. "This keeps us on track towards our goal to have a third of our sales in that region in 2006."

Gross margin for the first quarter of 2005 was approximately 62.8%, compared to 64.0% in the first quarter of 2004. Selling, general and administrative ("SG&A") expenses were approximately $11.1 million, or 40.2% of sales in the first quarter, an increase of $3.0 million from $8.1 million or 38.6% of sales in the first quarter of 2004. SG&A expenses as a percentage of sales were higher in the first quarter primarily as a result of the Company's ongoing expansion of sales offices, especially in the Asia Pacific region, and higher professional and legal expenses related to Sarbanes-Oxley compliance, international tax planning, and the filing of a registration statement on Form S-3 with the Securities and Exchange Commission ("SEC"). Research and development expenses were approximately $1.3 million for the first quarter of 2005, compared to $1.4 million in the first quarter of 2004.

Operating margin for the first quarter of 2005 was approximately 15.2%, a decrease of 0.7 percentage points from 15.9% in the first quarter of 2004. The effective income tax rate in the first quarter of 2005 was approximately 19.2% compared to 21.2% in the year-ago quarter.

**Revised Outlook for 2005**

On March 29, 2005 the Company announced its acquisition of iQvolution AG, a German manufacturer of a software driven laser-based measurement product which the company will sell under the name Laser Scanner LS. We expect this acquisition to add $4.0 - $6.0 million to sales, and to have a dilutive effect of approximately four to seven cents on earnings per share in 2005. We expect this acquisition to be accretive to earnings in 2006, as integration costs and a new sales force will be fully deployed and productive.

"We are enthusiastic about our latest acquisition as we see a lot of similarities with our two previous very successful acquisitions," said Raab. "We have a long-term commitment from the iQvolution management and key technical people, and their leading-edge technology and lower pricing compared to the competition. Combining this with our worldwide sales channel and name recognition should allow us to capture a larger portion of the growing laser scanner market."

The SEC has postponed the implementation date for expensing stock options until 2006, and this is expected to result in lowering our expenses by approximately $2.0 million, or 14 cents per share compared to our previous 2005 earnings per share guidance.

Therefore based on our actual first quarter results, the impact of the iQvolution acquisition, the postponement of FAS 123(R), and a 20% income tax rate we are increasing our guidance to sales of $125 - $132 million, and earnings per share of

$1.15 - $1.45 for 2005, compared to our prior guidance of $121 - $126 million and $1.03 - $1.36, respectively.

39.   On May 11, 2005, the Company filed with the SEC its Form 10-Q for 1Q05, which falsely stated that the Company's internal controls were effective:

> As of the end of the period covered by this Quarterly Report on Form 10-Q, management carried out an evaluation, under the supervision and with the participation of its Chief Executive Officer and its principal financial officer, of the effectiveness of the design and operation of its disclosure controls and procedures as such term is defined under Securities Exchange Act of 1934, as amended (the "Exchange Act") Rule 13a-15(e). Based on this evaluation, management has concluded that such disclosure controls and procedures were effective to provide reasonable assurance that the Company records, processes, summarizes and reports the information the Company must disclose in reports that the Company files or submits under the Exchange Act within the time periods specified in the SEC's rules and forms.

40.   On July 18, 2005, the Company issued a press release in which it pre-announced its 2Q05 financial results, which stated in relevant part:

> FARO Technologies, Inc. (NASDAQ: FARO) today reported sales of approximately $30.9 million in the fiscal second quarter ended July 2, 2005, a 28.2% increase from $24.1 million in the second quarter of 2004. The Company also reported new order bookings of approximately $34.5 million during the second quarter, an increase of $12.6 million, or 57.5% compared with approximately $21.9 million in the year-ago quarter. Backlog grew $3.6

million in the quarter to $6.1 million, and the Company expects to bring backlog down to approximately $3.0 million or less by the end of the third quarter. The Company has previously announced that it is accelerating its plans to establish a manufacturing plant in Singapore to address the growth in orders in the Asia/Pacific region.

The Company expects earnings per share for the second quarter of 2005 to be significantly less than the $0.29 it earned in the year-ago quarter because of lower gross margin, higher SG&A expenses as a percentage of sales and a short term inability to ship late arriving orders.

41. Shortly thereafter, on August 8, 2005, the Company issued a second press release concerning its 2Q05 financial results, and provided guidance for the remainder of FY05, which stated in relevant part:

FARO Technologies, Inc. (NASDAQ: FARO) today reported sales for the second quarter of 2005 of approximately $30.9 million, an increase of $6.8 million, or 28.2% from $24.1 million the second quarter of 2004. New order bookings for the second quarter were approximately $34.5 million, an increase of $12.6 million, or 57.5% compared with approximately $21.9 million in the year-ago quarter. That brought new order bookings for the first half of 2005 to approximately $59.6 million, an increase of $18.6 million, or 45.4% compared to $41.0 million in the first half of 2004. The Company reported net income for the second quarter ended July 2, 2005 of approximately $1.9 million or $0.13 per diluted share, a 53.7% decrease compared with approximately $4.1 million or $0.29 per diluted share in the second quarter of 2004.

Regionally sales increased 45.6% in the Americas to $15.0 million, from $10.3 million in the second quarter of 2004. Sales increased 12.0% in Europe/Africa to $12.1 million from $10.8 million in the second quarter of 2004. In the Asia/Pacific region sales increased 26.7% to $3.8 million from $3.0 million in the first quarter of 2004. New orders increased 64.4% in the Americas to $14.3 million, from $8.7 million in the second quarter of 2004. New orders increased 22.2% to $13.2 million in Europe/Africa from $10.8 million in the second quarter of 2004. In Asia/Pacific new orders grew 119% to $7.0 million from $3.2 million in the second quarter of 2004.

"We increased our sales force by 53 or 35% in the first half of 2005," said Simon Raab, Chief Executive Officer. "We continued to aggressively price our products to grow market demand. This investment has resulted in a dramatic increase in new orders, continued acceleration in growth rate and expansion of the CAM2 market. We are cutting G&A costs to drive profitability and we are increasing manufacturing capacity worldwide to meet this growing demand."

Gross margin for the second quarter of 2005 was approximately 59.5%, compared to 63.2% in the second quarter of 2004. Gross margin declined primarily as a result of higher price discounts and the impact of the integration of iQvolution (1.3%), which the Company acquired on March 29, 2005.

Selling, general and administrative ("SG&A") expenses were approximately $13.7 million, or 44.3% of sales in the second quarter, an increase of $4.8 million from $8.9 million or 36.9% of sales in the second quarter of 2004. SG&A expenses as a percentage of sales were higher in the second quarter primarily as a result of the Company's ongoing expansion of sales offices ($1.7 million), and higher expenses related to Sarbanes-Oxley 404 compliance ($313,000) and legal defense costs ($336,000). The Company hired 53 new sales people

34

in the first half of 2005 and expects a ramp up time of approximately 3-6 months for new sales people to become fully effective.

Operating margin for the second quarter of 2005 was approximately 7.3%, compared to 19.2% in the second quarter of 2004. The effective income tax rate in the second quarter of 2005 was approximately 14.1% compared to 15.6% in the year-ago quarter. Subsequent to the second quarter the Company has taken steps to reduce expenses. The Company expects that these steps will result in approximately $700,000 of reduced expenses for the remainder of 2005, of which approximately $500,000 will be directly related to SG&A and the remainder will lower production costs.

**Outlook for the remainder of 2005**

Based on the year-to-date new order growth, and on our historically stronger second half compared to the first half, we are maintaining our overall sales guidance at $125 - $132 million for fiscal 2005.

42.   On May August 10, 2005, the Company filed with the SEC its Form 10-Q for 2Q05, which stated that the Company's internal controls were effective:

During the second quarter of 2005, the Company changed its method of computing the pricing of inventory from average cost to FIFO. This change was made as a result of an inventory system conversion, to allow for improved system efficiencies. The underlying calculation between average cost and FIFO cost is not materially different. This change did not have a material impact on the results of operations for the second quarter of 2005, and is not expected to have a material impact for the full year or future years.

* * *

35

As of the end of the period covered by this Quarterly Report on Form 10-Q, management carried out an evaluation, under the supervision and with the participation of its Chief Executive Officer and its principal financial officer, of the effectiveness of the design and operation of its disclosure controls and procedures as such term is defined under Securities Exchange Act of 1934, as amended (the "Exchange Act") Rule 13a-15(e). Based on this evaluation, management has concluded that such disclosure controls and procedures were effective to provide reasonable assurance that the Company records, processes, summarizes and reports the information the Company must disclose in reports that the Company files or submits under the Exchange Act within the time periods specified in the SEC's rules and forms.

43.    On November 3, 2005, the Company issued a press release concerning its financial results for 3Q05, and provided guidance for the remainder of FY05, which stated in relevant part:

FARO Technologies, Inc. (NASDAQ: FARO) today reported record sales for the third quarter of 2005 of approximately $32.6 million and an increase of $9.2 million, or 39.3% from $23.4 million the third quarter of 2004. New order bookings for the third quarter were approximately $29.5 million, an increase of $6.5 million, or 28.3% compared with approximately $23.0 million in the year-ago quarter. The Company reported net income for the third quarter ended October 1, 2005 of approximately $2.6 million or $0.18 per diluted share, compared to approximately $3.1 million or $0.22 per diluted share in the third quarter of 2004. Third quarter 2005 results included a pre-tax cost of $1.6 million for inventory costing and consumption variances arising from the Company's

36

implementation of a new enterprise resource planning ("ERP") system.

Gross margin for the third quarter, which was negatively impacted by the previously mentioned adjustment to cost of goods sold, was 54.3% compared to 63.1% in the third quarter of 2004. Gross margin for the first nine months was 58.6%, more in line with the Company's historical gross margin. The Company has determined that issues arising from the ERP system migration have been corrected and it has implemented additional controls.

SG&A expenses as a percentage of sales dropped to the lowest level in eight quarters to 36.2%, compared to 38.5% in the third quarter of 2004. G&A expenses were 9.8% of sales in the third quarter compared to 13.7% in the third quarter of 2004, resulting in part from the Company's previously announced reductions in G&A expenses.

"As part of our long-term strategy we continue to take initiatives to position ourselves as the only unified technology and growth leader in the worldwide CAM2 market, a market which we began to define in 1998," said Simon Raab, CEO. "This year these steps include establishing a regional headquarters and manufacturing facility in Asia, the acquisition of a key new technology, highly-focused R&D spending, expansion of our worldwide sales forces, efficiency improvements, strategically competitive pricing to gain market share and specific restructuring actions on our administrative costs to accommodate what we expect will be ongoing legal battles with a newly consolidated competition.

"In the third quarter we have already seen the benefits from some of these initiatives, including Asia Pacific leading the way in new order growth, the successful launch of our new Targeting Laser Tracker, and a significant reduction in SG&A expenses as a percentage of sales. Other

initiatives will have an impact over the next few quarters as the sales force we hired for the new Laser Scanner product ramps up, and our Singapore manufacturing plant starts shipping."

* * *

Cash used in operating activities was $7.4 million year to date primarily to fund working capital needs commensurate with higher sales, including inventory to equip the additional sales staff with demo equipment, acquisition and integration of the new laser scanner product line and to supply the new Asia service center and production facility.

### Outlook for the remainder of 2005 and 2006

We are expecting sales in the fourth quarter of 2005 to be $33-$35 million, which would bring our fiscal 2005 sales to $124-$126 million. Based on gross margin of 56%-59% and a 15%-17% tax rate in the fourth quarter we expect earnings to be $0.19-$0.27, which would result in earnings for fiscal 2005 of $0.75-$0.83.

44.  The aforementioned statements contained in the Company's press releases and Form 10-Qs and 10-Ks failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless and grossly negligent in not knowing:

> a.  The Company was materially overstating its financial results by failing to properly value its inventory;

38

b.  The Company was materially overstating its financial results by failing to properly account for its SG&A expenses;

c.  The Company was materially overstating its financial results by artificially inflating the value of its sales as a result of making unlawful payments in connection with foreign sales activities in China; and

d.  As a result, the Company's financial statements were not prepared in accordance with GAAP, and therefore were materially false and misleading.

***The Truth is Revealed***

45.  On November 9, 2005, the Company filed with the SEC its Form 10-Q for 3Q05, which stated in relevant part that, contrary to the Company's prior assertions, the Company did *not* maintain adequate internal controls over its financial reporting:

> As of the end of the period covered by this Quarterly Report on Form 10-Q, management carried out an evaluation, under the supervision and with the participation of its Chief Executive Officer and its principal financial officer, of the effectiveness of the design and operation of its disclosure controls and procedures as such term is defined under Securities Exchange Act of 1934, as amended (the "Exchange Act") Rule 13a-15(e). *Based on this evaluation, management has concluded that such disclosure controls and procedures were, as a result of the inventory-related reason stated in the following paragraph, ineffective to provide reasonable assurance that the Company records, processes, summarizes and reports the information*

*the Company must disclose in reports that the Company files or submits under the Exchange Act within the time periods specified in the SEC's rules and forms.*

Commencing January of 2005, the Company implemented a new enterprise resource planning ("ERP") system. In order to ensure that the system had been properly implemented, management tested the physical inventory in October of 2005. *This testing identified a difference between the book balance reflected in the financial records and the physical inventory of approximately $1.6 million related to inventory costing and consumption variances. The Company believes that this represented a significant deficiency with regard to the Company's internal controls.* As a result of the discovery of this significant deficiency, the Company reviewed the inventory and production process maps and controls and implemented changes to its internal control over financial reporting. These changes include, but are not limited to, the security for item card setup and change, cycle count sample sizes and controls over the physical inventory reconciliation process. The implementation of the remediation steps has been completed and the Company has already performed some tests and will continue to test the effectiveness of these remediation steps during the remainder of 2005.

The changes in the company's internal control over financial reporting described in the previous paragraph were implemented prior to the Company reporting its results for the quarter and nine months ended October 1, 2005. There were no other changes in the Company's internal control over financial reporting during the quarter ended October 1, 2005 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.   (Emphasis added.)

40

46.    On January 19, 2006, the Company issued a press release in which it pre-announced its 4Q05 and FY05 financial results, which stated in relevant part:

> FARO Technologies, Inc. (Nasdaq: FARO) today announced that for the fourth quarter ended December 31, 2005, it expects to report sales of approximately $34.6 million, a 21.4% increase from $28.5 million in the fourth quarter of 2004, and within the $33-$35 million range given by the company on November 3, 2005. Earnings are now expected to be in the range of $0.03 to $0.05 per diluted share, rather than in the previously expected range of $0.19 to $0.27 per diluted share, and below the current First Call consensus estimate of $0.21 per diluted share.
>
> "Our fourth quarter sales and gross margin are expected to be within our forecasted ranges, as are R&D expenditures. However, SG&A expenses and income tax for the quarter are expected to be substantially higher than forecasted," said Jay Freeland, President and COO. *"Selling expenses are expected to be approximately $2.5 million higher than forecasted because of higher commissions ($1.5 million) in part related to payment of incentive bonuses for sales people who exceeded their annual goals, higher headcount ($700,000), and higher marketing costs ($300,000). General and Administrative expenses are expected to be approximately $700,000 higher than forecasted due to legal expenses, including patent litigation and our insurance deductible related to a class action suit brought against the Company in December ($450,000), and ramp up costs in our new Singapore headquarters ($250,000).* Our income tax rate for the quarter is expected to be approximately 25% vs. our estimate of 15-17% due to higher than expected sales in the Americas and lower than expected sales in Europe, the latter which is a lower tax jurisdiction for the Company. The net impact of

higher taxes to the company in the fourth quarter is expected to be approximately $100,000."

"Our expected fourth quarter results will bring annual sales to approximately $125.7 million for fiscal 2005, a 29.6% increase from $97.0 million in fiscal 2004," said Simon Raab, CEO. "Gross margin is expected to be approximately 58% for 2005, and we expect to report net income of approximately $8.5-$8.8 million or approximately 6.8%-7.0% of sales (approximately $0.59-$0.61 per share). The 2005 year was marked with significant positioning investments through geographic expansion and an acquisition, along with high legal expenses related to litigation and a more normalized tax rate of approximately 17.0%. We expect some additional headcount and other expansion expenses to spill over into the first half of 2006, and a continuation of legal costs related to litigation. However, I am optimistic that we will begin to leverage our growth-related expenses into improved operating margins by the second half of 2006."

47.    Shortly thereafter, on February 23, 2006, the Company issued a second press release concerning its 4Q05 and FY05 financial results, and provided guidance for FY06, which stated in relevant part:

FARO Technologies, Inc. (NASDAQ: FARO) today announced results for the fourth quarter and year ended December 31, 2005. Net income for the fourth quarter was approximately $0.2 million, or $0.01 per diluted share, a decrease of $4.7 million compared with $4.9 million or $0.34 per diluted share in the fourth quarter of 2004 and slightly lower than the revised guidance of $0.03 to $0.05 per diluted share submitted January 19, 2006 resulting from an increase in accruals for unbilled expenses and a slightly higher provision for taxes. Net income for the full year 2005 was approximately

$8.2 million or $0.57 per diluted share, a decrease of $6.7 million and $0.49 per share as compared with net income of $14.9 million, or $1.06 per diluted share in fiscal 2004.

Sales for the fourth quarter of 2005 were approximately $34.5 million, an increase of $6.0 million, or 21.1% from $28.5 million in the fourth quarter of 2004. New order bookings for the fourth quarter were approximately $34.7 million, an increase of $3.8 million, or 12.3% compared with approximately $30.9 million in the year-ago quarter. For the fiscal year ended December 31, 2005 the Company reported sales of approximately $125.6 million, a 29.5% increase from $97.0 million in fiscal 2004. New order bookings for fiscal 2005 were approximately $124.2 million, a 28.4% increase from approximately $96.7 million in fiscal 2004.

"Our 2005 sales growth of 29.5% marks the fourth consecutive year of top line growth in excess of 25%," said Simon Raab, Co-CEO. "The overall sales growth of the Company is an important benchmark as we believe that our customers are still in the early stages of the technology adoption lifecycle."

Gross margin for the fourth quarter of 2005 was approximately 56.6%, compared to 58.0% in the fourth quarter of 2004. Gross margin was lower in the fourth quarter due to shifts in product and regional mix as well as seasonal sell off of demonstration equipment. Gross margin for fiscal 2005 was 58.1%, 3.7 percentage points lower than the 61.8% reported in fiscal 2004, but in-line with the Company's five year historical average of 58.0%.

Selling, general and administrative ("SG&A") expenses were approximately $16.2 million, or 46.8% of sales in the fourth quarter, an increase of $4.6 million from $11.6 million or 40.7% of sales in the fourth quarter of 2004. SG&A expenses for fiscal 2005 were approximately $52.8 million or 42.0% of sales, an increase of $15.2 million from $37.6

million, or 38.8% of sales in fiscal 2004. Selling expenses as a percentage of sales were 33.7% in the fourth quarter of 2005, higher than the average of 28.2% for the three previous quarters in 2005, due in part to annual incentives primarily in the Americas region for exceeding annual sales targets. Selling expenses as a percentage of sales were 29.7% for fiscal 2005, higher than the Company's full year target of 25% due to the accelerated expansion in Asia and deployment of the sales force to support the new Laser Scanner LS product line. General and administrative expenses were 12.4% of sales for the full year 2005, only slightly higher than 12.1% in the prior year despite approximately $1.5 million in legal expenses related to the patent infringement dispute with Hexagon's Romer-Cimcore unit.

Research and development ("R&D") expenses were approximately $1.6 million for the fourth quarter of 2005, up slightly from $1.5 million in the fourth quarter of 2004. R&D expenses for fiscal 2005 were approximately $6.4 million, an increase of $1.0 million from $5.4 million in fiscal 2004 with much of the increase coming from new programs for the Laser Scanner LS. R&D expenses as a percentage of sales in 2005 were 5.1%, within the Company's target full year range of 5% - 7%.

Operating margin for the fourth quarter of 2005 was approximately 2.1%, a decrease of 7.7 percentage points from 9.8% in the fourth quarter of 2004, as a result of the previously mentioned lower gross margin and higher selling expenses in the quarter. Operating margin for fiscal 2005 was 8.1%, a decrease of 6.9 percentage points compared to 15.0% in fiscal 2004.

Income before income tax for the fourth quarter was approximately $0.4 million, a decrease from $3.1 million in the fourth quarter of 2004 as a result of the previously mentioned factors. Income before income tax for fiscal 2005 was approximately $9.9

44

million, a decrease of $5.4 million, or 35.3% from
$15.3 million in fiscal 2004.

The Company recorded income tax expense of
approximately $1.7 million for fiscal year 2005
compared to income tax of $0.4 million in the year
ago period.  The Company had an income tax benefit
of approximately $1.7 million in 2004 related to
the release of a previously reserved valuation
allowance on foreign deferred tax assets.
Excluding the effect of the release in valuation
allowance, the income tax rate for 2004 would have
been 13.5% as compared to 17.4% for fiscal 2005.

"2005 was a strategic investment year in which we
took sizable actions in very short periods of time
and made investments which position Faro for strong
continued growth.  Specifically, we acquired a
world-class technology platform, established a full
production facility and headquarters for our Asian
operation, and added over 100 new sales and
marketing personnel around the world to support our
2006 and 2007 growth plans.  We also managed to
keep our administrative expenses nearly flat as a
percentage of sales even as we incurred incremental
legal expenses of approximately $1.5 million
related to ongoing patent litigation and
approximately $0.5 million of incremental expenses
related to a full-year of Sarbanes-Oxley
compliance," commented Jay Freeland, Co-CEO.  "The
positioning investments we made in 2005 allow us to
shift our focus in 2006 towards creating growth
through leverage."

**Outlook for 2006**

Our target ranges for the full year 2006 include
sales growth of 20% - 25%, gross margins of
approximately 56% - 59% and net income of
approximately 6% - 10% as a percentage of sales.
These targets should be considered in the context
of our previously released 5 year target model.  As
to 2006 specifically, we expect net income as a
percent of sales in the first quarter to be well

45

below the bottom end of the annual range due to ongoing expense for patent litigation and higher selling expense as a percent of sales as the sales force added in the second half of 2005 become fully productive.

48.   On March 15, 2006, the Company further shocked the market when it announced that it would not be filing its annual report for FY05 at that time because the Company learned that suspicious paymentswere made by the Company in connection with foreign sales activities in China:

> FARO Technologies, Inc. (Nasdaq: FARO) today announced that as a result of an internal review conducted by the Company, *the Company recently learned of suspicious payments in connection with foreign sales activities in China*. As a consequence, the Company is conducting an internal investigation to determine the extent of any improper payments and possible deficiencies in its books and records and internal controls with respect to operations in China and the Asia/Pacific region, in possible violation of the anti-bribery, books and records and internal controls provisions of the Foreign Corrupt Practices Act.
>
> The Company voluntarily has notified the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") of this matter. The Company has provided information to the SEC and DOJ with regard to this internal investigation and is cooperating with the SEC and DOJ.
>
> Because this internal investigation is currently ongoing, the Company's filing of its Form 10-K for the year ended December 31, 2005 with the SEC will be delayed beyond the filing deadline of March 15, 2006. Based on current information, it is not possible to predict at this time when the Company

will file its Annual Report on Form 10-K, when
these matters will be resolved, what the outcome
will be, what sanctions, if any, will be imposed,
or the effect that such matters may ultimately have
on the Company or its consolidated financial
statements.

"FARO is working diligently to complete its
internal investigation and to file its Annual
Report on Form 10-K as soon as possible," said
Simon Raab and Jay Freeland, the Company's Co-Chief
Executive Officers. "Improper payments or other
violations of law will not be tolerated, and FARO
intends to cooperate with the DOJ and SEC so this
matter can be resolved as quickly as possible."

*For the years ended December 31, 2005 and 2004, the
Company's sales in China were approximately $9.0
and $4.2 million, respectively, or 7.1 percent and
4.3 percent of the Company's consolidated sales,
respectively.*

<u>Outlook for 2006</u>

In light of these developments, the Company
believes that it is prudent at this time to
withdraw its previous guidance for its 2006
financial targets that it released in February
2006. The Company intends to provide updated
guidance for 2006 when it is able to do so.

*FARO Admits it Violated the Foreign Corrupt Practices Act*

49.   On June 29, 2006, the Company finally filed its

delinquent Form 10-K for FY05. In the FY05 10-K, the Company

admitted that it had made certain payments to individuals in

Asia that violated the Foreign Corrupt Practices Act

("FCPA"), and that the Company had become the subject of

47

investigations by the SEC and the United States Department of Justice ("DOJ"):

> The Company's internal investigation has identified certain improper payments made in China and deficiencies in its controls with respect to its operations in China in possible violation of the FCPA. If the SEC or the DOJ determines that violations of the FCPA have occurred, they could seek civil and criminal sanctions, including monetary penalties, against the Company and/or certain of its employees, as well as additional changes to the Company's business practices and compliance programs. Based on current information, it is not possible to predict at this time when the SEC or DOJ investigations will be resolved, what the outcome will be, what sanctions, if any, will be imposed, or the effect that such matters may ultimately have on the Company or its consolidated financial statements. *Results of the investigation revealed that the referral fee payments in possible violation of the FCPA were $165,000 and $265,000 in 2004 and 2005, respectively, which were recorded in selling expenses in the Company's statement of income. The related sales to customers to which payment of these referral fees had been made totaled approximately $1.3 million and $3.24 million in 2004 and 2005, respectively [sic]. Additional improper referral fee payments of $122,000 were made in January and February 2006 related to sales contracts in 2005. The Company anticipates incurring expenses of at least $3.5 million in 2006 relating to its internal investigation of the FCPA matter.*

> * * *

> *The Company reported sales in China of $9.0 million in 2005 and $4.2 million in 2004, approximately 7% and 4% of total sales, respectively.* Depending on how this matter is resolved, the Company's sales in China could be significantly impacted. The

termination of certain personnel and cessation of improper payments in China may have a significant adverse effect on future operations in China because such action could negatively influence the decisions of a significant number of customers of the Chinese subsidiary to do business with that subsidiary. The potential magnitude of the loss of sales in China as a result of potential violations of the FCPA cannot be estimated at this time.

During the Company's internal investigation of its business practices in China, it became aware that income taxes related to certain commissions and bonus payments to its employees had not been properly reported. The Company will promptly remit any deficiencies after it has completed its investigation. At this time, the Company does not anticipate the amount will have a material effect on its financial condition or results of operations. The Company may be subject to penalties by the Chinese tax authorities, but we are not able to determine the amount, if any, of the assessment.

50.    According to the Company's Form 10-Q for 3Q07 filed on November 2, 2007, FARO stated that the violations of the FCPA were still not behind the Company as the SEC and the DOJ may seek certain civil and criminal remedies associated with the Company's conduct, and the Company had set aside millions of dollars in funds in anticipation of funding such remedies:

As previously reported by the Company, the Company learned that its China subsidiary had made payments to certain customers in China that may have violated the FCPA and other applicable laws. The Company's Audit Committee instituted an internal investigation into this matter in February 2006, and the Company voluntarily notified the SEC and the DOJ of this matter in March 2006. The Company's

49

internal investigation into this matter has been completed. The Company's internal investigation identified certain improper payments made in China and deficiencies in its controls with respect to its operations in China in possible violation of the FCPA.

Results of the investigation revealed that referral fee payments in possible violation of the FCPA were $165,000 and $265,000 in 2004 and 2005, respectively, which were recorded in selling expenses in the Company's statements of income. The related sales to customers to which payment of these referral fees had been made totaled approximately $1.3 million and $3.24 million in 2004 and 2005, respectively. Additional improper referral fee payments of $122,000 were made in January and February 2006 related to sales contracts in 2005. The Company had sales in China of $9.0 million in 2005 and $4.2 million in 2004, approximately 7% and 4% of total sales, respectively.

The Company has provided to the SEC and the DOJ information obtained during the course of this investigation and is cooperating with both agencies. The SEC and the DOJ have a broad range of civil and criminal remedies that they may seek to impose against corporations and individuals in appropriate circumstances, including without limitation disgorgement, fines, penalties, and other injunctive and equitable relief, as well as additional changes to the Company's business practices and compliance programs.

The Company has engaged in settlement discussions with both the SEC and the DOJ concerning the FCPA matter. Although there is no assurance that such discussions will result in a resolution of the FCPA matter, the Company has determined that the settlement discussions are likely to result in a resolution that will include a fine and disgorgement of associated profits. *The Company has recorded in the third quarter of 2007 a reserve of*

*$2.65 million in anticipation of the amount that could be necessary to satisfy its financial obligations to the SEC and the DOJ in resolving this matter.* Predicting at this time when the FCPA matter will be finally resolved with the SEC and the DOJ is not possible. The monetary sanctions ultimately paid by the Company to the SEC and the DOJ in resolving this matter, whether imposed on the Company or agreed to by settlement, may exceed the amount that has been reserved by the Company.

The Company anticipates that resolution of the matter will not result in formal criminal charges being filed against it by the DOJ. The Company expects that as part of the final resolution of the FCPA matter with the SEC and the DOJ, in addition to monetary sanctions, the Company will have continuing obligations with the SEC and the DOJ with respect to monitoring, compliance with the FCPA and other laws, full cooperation with the government, and the adoption of a compliance code containing specific provisions intended to prevent violations of the FCPA. The Company expects that the failure to comply with any such continuing obligations could result in the SEC and the DOJ seeking to impose penalties against the Company in the future.

### *Individual Defendants Sell Millions of Dollars of FARO Stock on Inside Information*

51.    Despite the Company's improper conduct, inadequate internal controls, and materially overstated financial results, and the fact that the Individual Defendants are and have been aware of such conduct at all relevant times, between May 12, 2004 and March 15, 2006, when the Company's stock price was at artificially inflated levels, certain of

the Individual Defendants sold substantial portions of their FARO common stock based upon material inside information.

52. On April 16, 2004, when the Individual Defendants began causing the Company to issue materially false and misleading statements concerning the condition of its financial statements and internal controls, the Company's stock closed at $22.44 per share. The Company's stock closed as high as $31.85 in December 2004 before declining to $22.38 per share on November 3, 2005, the last trading day before news of the Company's impaired financials and internal controls were disclosed. By March 16, 2006, the first trading day after full disclosure of the Company's financials and internal controls had been released, the Company's stock closed at $13.37 - approximately 40% lower than when the Insider Defendants began their stock-selling spree, and more than 58% lower than the Company's highest closing price during that period.

53. During the time that the Company's financial statements were materially inflated, and the truth of the Company's internal controls and unlawful conduct in Asia was still concealed, defendants Cole, d'Amours, Fraser, and Raab together sold, transferred, or otherwise disposed of more

52

than 270,000 shares of Company common stock for unlawful proceeds in excess of $7.3 million, thus lining their own pockets while continuing to mislead the general public of the real condition of the Company.

54. Not only did these defendants sell stock during the time that the Company's financial statements were materially inflated, and the true nature of the Company's business was withheld from the investing public, defendants Cole, d'Amours, Fraser, and Raab conducted sales that, at the time, consisted of substantial portions of their FARO holdings. The below table depicts the stock sales based upon unlawful inside information conducted by defendants Cole, d'Amours, Fraser, and Raab:

*See table on following page.*

53

| Name | Date of Transaction | Number of Shares Sold | Sale Price | Shares Remaining | Percentage of Holdings Sold | Proceeds |
|---|---|---|---|---|---|---|
| Cole | 5/26/04 | 32,495 | $26.37 | 0 | 100.00% | $ 856,753.42 |
| d'Amours | 5/18/05 | 11,000 | $28.00 | 3,075 | 78.15% | $ 308,000.00 |
| Fraser | 5/12/04 | 33,000 | $23.45 | 329,685 | 9.10% | $ 773,998.50 |
| Fraser | 5/13/04 | 45,500 | $23.39 | 284,185 | 13.80% | $1,064,363.30 |
| Raab | 5/12/04 | 33,000 | $23.55 | 285,221 | 10.37% | $ 776,998.20 |
| Raab | 5/13/04 | 90,500 | $32.39 | 194,721 | 31.73% | $2,931,530.30 |
| Raab | 5/14/04 | 25,000 | $23.79 | 169,721 | 12.84% | $ 594,725.00 |
| TOTAL | | 270,495 | | | | $7,306,368.72 |

55.    At the time that the stock sales referenced in the above paragraph were made, each of Defendants Cole, d'Amours, Fraser, and Raab knew that the Company's financial statements were false and materially overstated, that the Company had disseminated false and misleading statements concerning the condition of the Company's internal controls, and that the Company was engaging in unlawful sales practices in Asia in order to inflate the Company's sales figures, and that the Company's stock price was materially inflated as a result thereof.

### *FARO Becomes the Subject of Class Action Securities Litigation; Class Action Survives FARO's Motion to Dismiss*

56.    On December 6, 2005, the Company became the subject of four essentially identical class action securities fraud lawsuits, which were consolidated on April 19, 2006 as *In re FARO Technologies Securities Litigation*, Lead Case No. 6:05-cv-1810-Orl-22DAB (the "Securities Action").

57.    On or about August 7, 2007, United States Magistrate Judge David A. Baker issued a Report and Recommendation to the United States District Court for the Middle District of Florida, Orlando Division, that the motion

to dismiss the Securities Action should be denied (the "R&R"). The R&R was approved and adopted by the Court on September 18, 2007, and the motion to dismiss the Securities Action was denied.

58. In the R&R, Judge Baker made several findings concerning certain conduct by several of the defendants during the Class Period (April 16, 2004 through March 15, 2006). Among the findings by Judge Baker are that the Securities Action adequately sets forth allegations to establish that the defendants:

>   a.   Inflated gross margins by consciously overstating the value of FARO's inventory and thereby understating its cost of goods sold ("COGS");
>
>   b.   Concealed the fact that gross margins and profits were overstated because FARO was failing to report the true amount of sales commissions;
>
>   c.   Overstated the amount of sales by including sales achieved through unlawful conduct in Asia in violation of the FCPA; and
>
>   d.   Failed to disclose the serious deficiencies in FARO's internal control systems.

59. Indeed, the R&R stated that the allegations in the Securities Action were sufficient to satisfy *all elements* of

a securities fraud claim, and, in denying the motion to dismiss, specifically stated:

> In spite of a direct invitation to do so, the FARO Defendants do not provide the Court with a "plausible opposing inference" sufficient to counter the significant weight of the scienter inference that arises from the totality of the allegations.  In fact, the absence of any suggested counter inference strengthens the contention that there can be but one conclusion drawn from the facts, as pled.  A complaint will survive only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  As no opposing inference is evident, the inference of scienter is cogent, indeed.  (Internal citations omitted.)

## THE INDIVIDUAL DEFENDANTS ABDICATED THEIR FIDUCIARY DUTIES

60.   Throughout at least 2004, 2005, and 2006 the Individual Defendants received numerous reports regarding problems with the Company's accounting, revenue recognition, and internal control practices and procedures.  Through their attendance at Board, AC, OAC, and management meetings; their review of the Company's financial statements; and conversations with the Company's management, internal auditors, and external auditors, the Individual Defendants knew that FARO's accounting and revenue recognition practices were improper, its internal controls were materially deficient, and it was in violation of the FCPA.

57

61.   In breach of both their fiduciary duty of good faith and, with respect to the members of the OAC and AC, their responsibilities pursuant to the OAC and AC charters, respectively, the Individual Defendants willfully ignored the obvious and pervasive problems with the Company's accounting, revenue recognition, internal control practices and procedures, and compliance with the FCPA, and failed to make a good faith effort to correct the problems or prevent their recurrence.

62.   The foregoing misconduct of the Individual Defendants caused FARO to sustain damages, including, but not limited to, costs and expenses associated with the SEC and DOJ investigations of the Company as well as loss of good will.

## DERIVATIVE AND DEMAND ALLEGATIONS

63.   Plaintiff brings this action derivatively in the right and for the benefit of FARO to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants.

58

64.    Plaintiff will adequately and fairly represent the interests of FARO and its shareholders in enforcing and prosecuting its rights.

65.    Plaintiff is an owner of FARO common stock and was an owner of FARO common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

66.    On September 11, 2007, Plaintiff made a demand (the "Demand") on the Board to commence an action against certain directors and executive officers of FARO.    A copy of Plaintiff's Demand is attached hereto as Exhibit A.

**COUNT I**
**AGAINST THE INDIVIDUAL DEFENDANTS**
**FOR VIOLATIONS OF § 10(b) AND RULE 10b-5**
**OF THE SECURITIES EXCHANGE ACT**

67.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

68.    Individual Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a

course of business which operated as a fraud and deceit upon the Company.

69.    Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.   Through their positions of control and authority as officers and/or directors of the Company, each of Individual Defendants was able to and did control the conduct complained of herein.

70.    Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.   Individual Defendants were among the senior management and directors of the Company and were therefore directly responsible for the fraud alleged herein.

71.    The Company relied upon Individual Defendants' fraud in granting Individual Defendants compensation during the course of their employment at the Company including, but not limited to, Company stock and stock options.

72.   As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages.

### COUNT II
### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTIES
### IN CONNECTION WITH IMPROPER BUSINESS PRACTICES

73.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

74.   As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

75.   Despite their actual knowledge of the Company's improper business practices, including, but not limited to, violating FCPA, the Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

76. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

### COUNT III
### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTIES
### IN CONNECTION WITH INTERNAL CONTROLS

77. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

78. As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

79. As alleged herein, the Individual Defendants willfully ignored the obvious and pervasive problems with FARO's accounting and internal control practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

80. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

### COUNT IV
### AGAINST DEFENDANTS COLE, d'AMOURS, FRASER, AND RAAB
### FOR BREACH OF FIDUCIARY DUTIES
### IN CONNECTION WITH INSIDER STOCK SALES

81. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

82. At the time of each of the stock sales set forth herein, each of defendants Cole, d'Amours, Fraser, and Raab knew, but did not disclose publicly, that the Company's financial results were false and misleading as a result of the Company's failure to comply with applicable federal and state laws. Each of defendants Cole, d'Amours, Fraser, and Raab made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

83. At the time of their stock sales, each of defendants Cole, d'Amours, Fraser, and Raab knew that when it was disclosed that the Company's financial results were false and misleading as a result of the Company's failure to comply with applicable federal and state laws, the price of the

Company's common stock would dramatically decrease. Defendants Cole, d'Amours, Fraser, and Raab's sales of FARO common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

84.   Since the use of the Company's proprietary information for their own gain constitutes a breach of defendants Cole, d'Amours, Fraser, and Raab's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds defendants Cole, d'Amours, Fraser, and Raab obtained thereby.

### COUNT V
### AGAINST DEFENDANTS COLE, d'AMOURS, FRASER, AND RAAB
### FOR UNJUST ENRICHMENT IN CONNECTION WITH INSIDER STOCK SALES

85.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

86.   Defendants Cole, d'Amours, Fraser, and Raab were unjustly enriched by their receipt of proceeds from their illegal sales of FARO common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

87.    To remedy defendants Cole, d'Amours, Fraser, and Raab's unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of FARO common stock.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Imposing a constructive trust in favor of the Company for the amount of proceeds each of defendants Cole, d'Amours, Fraser, and Raab received from their sales of FARO common stock alleged herein, in addition to all proceeds otherwise derived from their service as directors and/or executives of the Company;

C.    Ordering defendants Cole, d'Amours, Fraser, and Raab to disgorge to the Company all proceeds derived from their illegal sales of FARO common stock alleged herein, in addition to all proceeds otherwise derived from their service as directors and/or executives of the Company;

D.    Ordering appropriate equitable relief to remedy Defendants' misconduct;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated this 9th day of January, 2008.

Respectfully submitted,

SNYDERBURN, RISROI & SWANN

PHILIP J. SNYDERBURN, ESQUIRE
Florida Bar No. 0202592
E-Mail:  psnyderburn@srslaw.net
K. MICHAEL SWANN, ESQUIRE
Florida Bar No. 0442410
E-Mail : mswann@srslaw.net
258 Southhall Lane, Suite 420
Maitland, Florida 32751
Telephone:  (407) 647-2005
Facsimile:  (407) 647-1522


SCHIFFRIN BARROWAY TOPAZ
KESSLER, LLP

ERIC L. ZAGAR, ESQUIRE
E-Mail: ezagar@sbtklaw.com
ROBIN WINCHESTER, ESQUIRE
E-Mail: rwinchester@sbtklaw.com
JAMES H. MILLER, ESQUIRE
E-Mail: jmiller@sbtklaw.com
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff*

## VERIFICATION

I, David Alverson, trustee, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.   I declare under penalty of perjury that the foregoing is true and correct.


DATE: _Dec. 21, 2007_                              _David Alverson_
                                                    DAVID ALVERSON



**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Attorneys at Law

www.sbtklaw.com

---

280 King of Prussia Road • Radnor, Pennsylvania 19087 • (610) 667-7706 • Fax: (610) 667-7056
2125 Oak Grove Road, Suite 120 • Walnut Creek, California 94598 • (925) 945-0200 • Fax: (925) 945-8792

Writer's Direct Dial:  (610) 822-2209
E-Mail: ezagar@sbtklaw.com

September 11, 2007

**VIA FEDEX**

Stephen R. Cole
Lead Director
FARO Technologies, Inc.
125 Technology Park
Lake Mary, Florida 32746

Re:    Shareholder Demand

Dear Mr. Cole:

This firm represents David Alverson, a holder of shares of common stock of FARO Technologies, Inc. ("FARO" or the "Company"). I write on behalf of Mr. Alverson to demand that the Board of Directors of FARO (the "Board") take action to remedy breaches of fiduciary duties by the directors and certain executive officers of the Company, as described herein.

As you are aware, by reason of their positions as officers and/or directors of FARO and because of their ability to control the business and corporate affairs of FARO, the officers and directors of the Company owe FARO and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and are required to use their utmost ability to control and manage FARO in a fair, just, honest and equitable manner. Mr. Alverson believes that the following officers and/or directors of the Company violated these core fiduciary duty principles, causing FARO to suffer damages: Chairman of the Board of FARO, Simon Raab; former director and Executive Vice President of FARO, Gregory Fraser; Audit Committee of the Board ("Audit Committee") member Hubert d'Amours; and Audit Committee and Operation Audit Committee of the Board ("Operation Audit Committee") members, John Caldwell and Andrew Julien (collectively, the "Directors and Officers").

Mr. Alverson contends that since 2003, and possibly earlier periods, the Company violated Generally Accepted Accounting Principles ("GAAP") by improperly accounting for its inventory, which had the effect of understating the Company's cost of goods sold ("COGS"), thereby inflating the Company's reported earnings. Furthermore, Mr. Alverson contends that the



EXHIBIT

A



Stephen R. Cole
September 11, 2007
Page 2

Company violated the Foreign Corrupt Practices Act by making certain payments to foreign customers in order to achieve Company sales in Asia.

Mr. Alverson maintains that each of the Directors and Officers beached their fiduciary duties by: (i) knowingly approving the Company's accounting improprieties, and/or abdicating their responsibility to make a good faith effort to oversee the Company's operations and accounting practices; and (ii) knowingly approving the Company's foreign sales practices, and/or abdicating their responsibility to make a good faith effort to oversee the Company's foreign business operations. Mr. Alverson believes that the acts (and failures to act) described above represent a systematic failure of the Directors and Officers to effectively manage the affairs of FARO. Among other things, it is apparent that the Directors and Officers have failed to implement necessary oversight procedures and controls to effectively manage FARO. The Directors and Officers' systematic failure to properly manage the Company violates their fiduciary duties of loyalty and good faith. As a result of the foregoing breaches of duty, FARO has sustained damages including, but not limited to, damages associated with the unlawful payments to foreign customers, the costs of compliance with and defense of the investigations of the Company by the United States Securities and Exchange Commission and Department of Justice, and the costs of the defense against the securities class action titled *In re Faro Technologies, Inc. Securities Litigation*, Civil Action No. 6:05-cv-1810-ACC-DAB currently pending in the United States District Court for the Middle District of Florida.

On behalf of Mr. Alverson, I hereby demand that the Board take action against each of the Directors and Officers to recover for the benefit of the Company the damages described herein.

If within a reasonable period of time after receipt of this letter, the Board has not commenced an action as demanded herein, Mr. Alverson will commence a shareholder's derivative action on behalf of FARO seeking appropriate relief.

Sincerely,

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP

Eric L. Zagar / by James M. Mill

Eric L. Zagar

ELZ/jhm